**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

RONALD BATES,

      Plaintiff,

           v.

CITY OF CHICAGO, et al.,

      Defendants.

No. 05 C 1564
Judge James B. Zagel

**MEMORANDUM OPINION AND ORDER**

## I.    INTRODUCTION

This case involves allegations of race discrimination against the City of Chicago and senior personnel of the Chicago Fire Department ("CFD") stemming from the demotion of Plaintiff Ronald Bates, a former CFD District Chief. Before me are cross-motions for summary judgment on Counts II and III. For the following reasons, Plaintiff's motion for summary judgment is denied and Defendant's motion for summary judgment is granted. I also reverse my December 14, 2009, order reinstating Count I and reenter summary judgment in favor of Defendant City of Chicago.

## II.    PROCEDURAL HISTORY

This case has a rather complex history in this court that is worth reviewing before getting to the instant motions. In October 2005, Plaintiff filed a four-count amended complaint against the City of Chicago and several individual CFD employees alleging employment discrimination based on race, in violation of Title VII of the Civil Rights Act of 1964 (Count I); deprivation of Fourteenth Amendment rights under color of law, in violation of 42 U.S.C. § 1983 (Count II);

interference of contractual rights based on race, in violation of 42 U.S.C. § 1981 (Count III); and intentional infliction of emotional distress (Count IV).

On November 10, 2005, I dismissed Count IV as well as all claims against the individual defendants in their official capacities for reasons stated in open court. On March 16, 2006, I dismissed Counts II against all individual defendants except Defendant Trotter, finding that the other individual defendants were entitled to qualified immunity. I also dismissed Count III in its entirety, finding that Plaintiff had no contractual employment right upon which to base his § 1981 claim. On September 4, 2008, I granted summary judgment on Count I in favor of Defendant City of Chicago, finding that Plaintiff could not make out a prima facie case of discrimination.

On December 14, 2009, I granted Plaintiff's Rule 59 motion to alter judgment and reinstated Count III as to Defendant Trotter and Count I as to Defendant City of Chicago. I based my decision to reinstate Count III on the holding in *Walker v. Abbott Labs*, 340 F.3d 471 (7th Cir. 2003), where the Seventh Circuit found that an at-will relationship can be sufficiently contractual to support a claim of racial discrimination in promotion and pay under § 1981. I reinstated Count I as to Defendant City of Chicago, finding that Plaintiff had in fact made a sufficient showing that Defendant Trotter's explanation was a pretext for unlawful discrimination. The instant summary judgment motions pertain to Counts II and III against Defendant Trotter.

### III.    GENERAL BACKGROUND

The Municipal Code and CFD Hierarchy

The City of Chicago Municipal Code (the "Municipal Code") distinguishes between career service and non-career (or "exempt") employees.  The Municipal Code does not provide that non-career service employees may be discharged or demoted only "for cause," nor does it establish procedures whereby non-career service employees may challenge their terminations or demotions.  The City's personnel rules provide that non-career service employees are at-will employees who "may be disciplined or discharged at any time for any reason or no reason and have no expectation of continued employment."  The rules further provide that Department heads "shall expressly have the right to discipline or otherwise take actions concerning a non-Career Service subordinate."  The non-career service, "at will" positions of the CFD include firefighters above the rank of Battalion Chief.

The CFD is organized into geographical regions called "Districts," each of which is headed by a District Chief.  The Command Structure within a CFD District is, in descending order, as follows: District Chief, Deputy District Chief, Battalion Chief, Captain, Lieutenant, Engineer, Firefighter.  The command structure of the CFD above the District level is, again in descending order, as follows: Fire Commissioner, First Deputy Fire Commissioner, Deputy Fire Commissioner, Assistant Deputy Fire Commissioner.

Plaintiff's Employment History

Plaintiff joined the CFD as a firefighter in 1977.  He was promoted to the career service ranks of Lieutenant on September 1, 1980; Captain on October 16, 1987; and Battalion Chief on August 1, 1989.  Plaintiff was appointed to the exempt rank positions of Deputy District Chief on

March 16, 1998, and District Chief of the Sixth District on January 1, 2000. Plaintiff was appointed to District Chief of the Sixth District by then Commissioner James Joyce ("Joyce"), who is Caucasian. Plaintiff retired from his employment with the CFD effective November 13, 2005. He was unable to return from medical leave after one year.

Defendant Trotter's Employment History

On May 1, 2004, Defendant Trotter was appointed as Commissioner of the CFD. He was first hired by the CFD in 1976 as a Fire Paramedic and appointed to Fire Paramedic Area Supervisor in April 1980, to Paramedic District Officer in February 1982 and to Assistant Chief Paramedic in June 1989. He was promoted to Deputy Fire Commissioner in December 1993, and to First Deputy Fire Commissioner in January 2000. He then served as First Deputy Fire Commissioner from January 2000 until approximately May 2001, when he was appointed Executive Director of the City's Office at Emergency Management and Communications ("OEMC"). Defendant remained at OEMC as Executive Director until he was appointed Commissioner of the CFD in May 2004. He served as Commissioner of the CFD from May 2004 until he voluntarily resigned from his employment with the CFD in approximately April 2006.

Commissioner Trotter's Exempt Rank Appointments

When Defendant became Commissioner he was authorized to choose his own exempt rank management staff. The exempt rank appointments Defendant made during his tenure as Commissioner were memorialized in the following CFD Personnel Orders: Personnel Order No. 2004-10 (May 24, 2004); Personnel Order No. 2004-10A (May 26, 2004); Personnel Order No. 2005-03 (March 15, 2005); Personnel Order No. 2005-09 (June 29, 2005); Personnel Order No.

2005-16 (August 26, 2005); and Personnel Order No. 2006-02 (January 13, 2006). (Tab K, Defendant Aff. ¶2.)  Plaintiff denies that Defendant's exempt rank appointment of Michael Callahan, Caucasian, to the position of District Chief, Third District, apparently replacing Sal Marquez, was memorialized in any of the six CFD Personnel Orders listed in this statement but does not deny that the appointment was made.

In making his personnel decisions, Defendant was looking to appoint individuals who would reflect his "aggressive management style," had "high energy and enthusiasm," and who appeared to be "engaged in what they're doing."  Plaintiff states that there is evidence which Defendant City of Chicago withheld in discovery, evidence which would enable Plaintiff to further refute Defendant's purported appointment criteria, but Plaintiff does not deny that the statement is true based on the evidence in his possession.  Plaintiff does not explain how he knows the content of evidence he claims is withheld.  I strike the denial of statement 15 for this reason.  I do note that receiving direction from others as to whom a Commissioner should appoint is not inconsistent with Defendant's stated criteria for appointment.

Defendant explained that his exempt rank appointment process was not "scientific."  He went with his "opinion and [his] gut" as to who he wanted in the positions, and relied on his impressions of individuals he had formulated during his interactions with them over his years at the CFD.  During these years, Defendant had opportunities to interact with many members of the CFD in a variety of settings, including meetings, training sessions, fire and other emergency incidents, recruit graduation ceremonies, promotional ceremonies, funerals, banquets, and other CFD events.  Defendant explained that during the course of his employment with the CFD he had

some opportunity to interact with all of the people that he demoted or promoted while he was Commissioner.

On May 24, 2004, Defendant issued Personnel Order No. 2004-10, appointing the exempt ranks under his chain of command.  Below is a list identifying the African-American individuals Defendant appointed to the exempt ranks pursuant to P.O. No. 2004-10 and whether the appointment was a promotion, demotion or lateral reassignment:

1.  Burns, Charles, Jr. – Demotion

2.  Jackson, Derrick F. – Lateral reassignment

3.  Noy, Leslie E. – Promotion

4.  Boatner, Joe W. – Demotion

5.  Brooks, John W. – Promotion

6.  Russell, Nicholas – Promotion

7.  Gault, Dennis V. – Promotion

8.  Stewart, Charles III – Demotion

9.  Pinkston, Ernie L. – Promotion

10. Shelton, Jerome – Promotion

11. Plaintiff, Ronald – Demotion

12. Muse, Barbara – Promotion

All together, Defendant promoted seven African-American individuals pursuant to P.O. No. 2004-10 and demoted four.  Except for a claimed inconsistency between two of Defendant's statements about Joe Boatner, this is admitted.

Defendant made these appointments based on his experience and "what [he] felt was the best possible makeup of the department…."  Defendant selected people who he felt "were a good fit for the positions."  Plaintiff denies this is so in his case because Defendant did not observe him in the position of District Chief. One key premise of Plaintiff's argument is that Defendant could not make the judgments as he says he did unless he observed Plaintiff as a District Chief.

When Defendant took over as Commissioner, there were only two African-Americans serving in the position of District Chief, Plaintiff and Leslie Noy.  When Defendant selected his exempt ranks he demoted those two and promoted five individuals to the position of District Chief (John Brooks ("Brooks"), Cortez Holland ("Holland"), Robert Hoff ("Hoff"), Raymond Orozco ("Orozco") and Nicholas Russell ("Russell")).  Three of these individuals (Brooks, Holland and Russell) are African-American.

In Defendant's expressed opinion, the primary responsibilities of a District Chief are to carry out the goals as set by the Fire Commissioner.  Defendant's primary goals as Commissioner were to do everything possible to protect the people of Chicago and to ensure that the people had trust and confidence in the CFD.

The plaintiff says this cannot be so because he appointed at least one man who, in the opinion of a prior Commissioner, was "somewhat short in the area of fire suppression.... experience." This appears to be a simple disagreement based on Plaintiff's opinion that, had he been commissioner, he would not have appointed this individual.  As stated, this is not a denial but rather an assertion of mistake.

Defendant selected his District Chiefs based on whom he felt was compatible with his management style and his goals.  Some of the qualities Defendant desired in his District Chiefs

included "aggressiveness, enthusiasm, high-energy level [and] attention to detail."  Defendant believed the individuals he appointed to the position of District Chief fit his management style and were "the best for the position at the time."  Defendant said he demoted Plaintiff but never said in response to highly specific questions in two depositions and in his declaration that Plaintiff lacked "aggressiveness, enthusiasm, a high energy level or attention to detail."  Defendant testified that performance was one of the criteria he used in selecting District Chiefs and that he did not have a negative opinion of Plaintiff' performance as District Chief.

Defendant explained that "the people that [he] put in the position of District Chief like every other Fire Commissioner were people that [he] felt comfortable with, people that [he] had the most confidence in and the people that [he] thought would do the best job for [him]."  Former Commissioner Joyce explained that, from his experience, it was typical for an incoming Fire Commissioner to appoint his own exempt rank staff.  When Joyce became Commissioner in 2000, he reorganized the exempt ranks and "appointed [his] personal staff, which [included] the First Deputy Fire Commissioner, the Deputy Fire Commissioner, and some of the District Chiefs."  Joyce explained that he reorganized the exempt ranks because he "wanted to put a staff in place that [he] was familiar with and would be on the same page [he] was on as [they] attempted to bring the fire department and advance it into the future."

Former Deputy Fire Commissioner James Connolly ("Connolly") (non-African-American), who was demoted pursuant to P.O. No. 2004-10, stated that, from his experience working with "several Fire Commissioners," when a new Commissioner is appointed "individuals were replaced and added and so on and so forth."  Connolly added that each

Commissioner had "the opportunity to put their own people in place to run their operations the way they wanted them run."

One of Defendant's personnel changes in P.O. No. 2004-10 was Plaintiff' removal from the position of District Chief and appointment to the position of Deputy District Chief, Operations Relief. Defendant replaced Plaintiff with another African-American, Nicholas Russell, who at the time was President of the African-American Firefighters League ("AAFL"). Defendant explained that he kept Plaintiff in his exempt ranks but felt that Russell "was better able to carry out [his] goals and reflect [his] management style."

Before Defendant was appointed Commissioner, he and Russell appeared together as guests on a television program called "The Chicago Tonight Show." One of the topics Defendant and Russell discussed on the program was Russell's work for the AAFL, an organization devoted to the advancement of African-American firefighters. Defendant was impressed by Russell's performance on the television program.

I note, in response to this, Plaintiff makes the unwise assertion that performance on television is not one of the responsibilities of a District Chief. In fact, the appearance of any command personnel in a public or televised setting forms a significant part of the image of the department and its ability to promote public confidence and reliance on the department itself.

In addition, Defendant interacted with Russell at the scene of a train derailment at 1220 East 55th Street, Chicago, Illinois sometime in 2001 or 2002. At the time, Russell was a Battalion Chief and Defendant was Executive Director of OEMC. Russell explained to Defendant what had happened from "the firefighters" point of view and concerning [Russell's]

9

sector." Specifically, Russell told Defendant "we had a number of injuries; we set up triage; we had Truck 15, [and were] assisting with getting people off of the train...."

Defendant did not feel that Plaintiff was the type of individual he was looking for as part of his District Chief ranks. Defendant's decision to demote Plaintiff was based on "[his] own personal assessment, [his] own judgment [and his] own feeling" as to whether Plaintiff fit the "aggressive leadership style and management style" that he needed. Defendant was looking for a "certain level of enthusiasm and aggressiveness and [] [sic] other traits" and he did not recall observing these characteristics in Plaintiff. The plaintiff does not deny that these were Defendant's opinions. He reiterates his assertion that Defendant did not observe any of Bate's management style or his performance in training sessions or meetings.

These criteria, I note, are not the sole circumstances from which a Commissioner can decide leadership compatibility. A few simple conversations and occasional interactions may decide the question and, on occasion, the decision may be made simply on the basis of what the Commissioner hears others say about a candidate. Exempt ranks exist so that departmental leaders can choose, rightly or mistakenly, with whom they might be most comfortable on their command team.

Defendant said he formed an opinion of Plaintiff based on their interactions over the years at the CFD. Defendant explained that Plaintiff was "not a stranger" to him, and they had opportunities to interact during their "decades" of both being employed with the CFD. Defendant stated that, to the best of his recollection, he had very few interactions with Plaintiff but they were "enough for [Defendant]… to have formed an opinion." Plaintiff recalled just two brief conversations with Defendant.

Defendant did not have negative opinions regarding how Plaintiff performed as District Chief.  Before he was appointed Commissioner, however, Defendant observed Plaintiff at CFD meetings and was not impressed by the "overall demeanor" or the "level of enthusiasm that [he] saw" in Plaintiff.  Defendant felt that Plaintiff fit best in his administration as Deputy District Chief.  Plaintiff denied that Defendant observed Plaintiff at CFD meetings, which I construe to mean either that Plaintiff asserts that Defendant was never at a CFD meeting attended by Plaintiff or that Plaintiff never saw Defendant observing him at such meetings.

At his deposition, Plaintiff may have acknowledged that he has had approximately "three or four" conversations with Defendant.  Plaintiff agrees he had a conversation with Defendant in 2000 after a speech Defendant gave at an event dealing with the subject of battered spouses. After Defendant finished his speech, Plaintiff told him that he did a good job and Defendant responded, "Thank you."  In any event I do not think it is in dispute that the two men had contact with each other which neither has characterized as extensive or particularly meaningful.

In 2002, Plaintiff called Defendant while Defendant was the head of OEMC to let him know that an African-American friend of his, Mark Booker, was seeking employment at OEMC. Plaintiff told Defendant that Booker was a "good guy…for what it was worth." Defendant responded, "Okay, I will keep that in mind."  Thereafter, Booker was hired by the OEMC.

Defendant recalls Plaintiff being present when he met with some of the exempt ranks sometime after January 2000 to discuss policy issue at the request of then Commissioner Joyce. At the time of the meeting, Defendant was First Deputy Commissioner and Plaintiff was a District Chief.  The meeting was held at the CFD Fire Academy and everyone present gave Defendant their opinion regarding the matter being discussed.

At his depositions in 2006 and 2011, Defendant was asked detailed questions about his interactions with Plaintiff.  Defendant cannot recall specific dates and times and settings of his interactions with Plaintiff because they occurred many years ago and because Defendant attended many CFD events and meetings during his tenure with the CFD.  Defendant also explained that it was "not out of the ordinary" for him to meet with the "command and exempt rank members of the Fire Department."

Plaintiff has acknowledged that while he was a District Chief he was present at a meeting (referred to in statement 38) with Defendant and some of the other exempt ranks in late 2000.  Plaintiff stated that Defendant came to the meeting to discuss a pay raise, and told those in attendance that Commissioner Joyce asked him to attend on his behalf.  Plaintiff says Defendant arrived before the formal meeting began and left after twenty to thirty minutes of this and before the meeting started.

At the meeting, Defendant explained to the attendees that Joyce could get them pay raises at that time but doing so would put Joyce in a bad light with the Finance Department.  Defendant wanted to know how they felt about putting off the pay raises.  Plaintiff stated that "they went around the table.  And each guy said something about how he felt."  Plaintiff told Defendant that he was "okay with it if it's going to put Commissioner Joyce in a bad light."  Plaintiff admits this statement but its meaning is unclear.  On the one hand, it could be read as meaning Plaintiff was okay with Joyce being put in a bad light so long as pay raises were not delayed.  The opposite interpretation is equally plausible–that Plaintiff thought it was okay to delay the pay raises if doing so would be best for the Commissioner.  Neither side has clarified this statement but, ultimately, it does not matter.  If the first interpretation is correct then it could raise a reasonable

12

concern in Defendant's mind about Plaintiff's loyalty. If the latter is correct, it does not establish that Defendant's proffered non-discriminatory reasons for demoting Plaintiff are pretextual.

Joyce did not have any meetings with Defendant during Defendant's transition to Commissioner. Joyce did not make any recommendations or provide advice to Defendant regarding personnel changes. Joyce never had any conversations with Defendant regarding Plaintiff's performance. Joyce did tell Plaintiff (at a retirement party for another firefighter) that Defendant told Joyce he wanted Plaintiff's resume. Defendant did not conduct any meetings to decide which persons were to be assigned to the position of District Chief, nor did he conduct any meetings or consult with any of Plaintiff's supervisors or subordinates regarding Plaintiff's demotion, though he may have asked for resumes and did receive recommendations that certain persons were good people to be promoted. Defendant did not have any specific conversations with anyone regarding Plaintiff's performance as District Chief. Defendant said that appointing individuals who fit his management style was more important to him than how someone was performing as District Chief.

Joe Boatner ("Boatner") was one of Plaintiff's supervisors while he was District Chief. Defendant did not ask Boatner about Plaintiff's qualifications or performance as District Chief. Deputy Fire Commissioner Connolly was one of Plaintiff's superiors while he was District Chief. Defendant did not ask Connolly about Plaintiff's qualifications or performance as District Chief. Defendant never discussed Plaintiff's performance with either Thomas Donnellan ("Donnellan") or James Kehoe ("Kehoe").

Plaintiff never heard Defendant make any racial comments. Defendant never spoke to Plaintiff in a disrespectful or demeaning manor. In demoting Plaintiff, Defendant said he applied

the same standard he used with respect to all of the other exempt rank appointments he made during his tenure as Commissioner.

There was an incident in which Defendant took action with respect to William Donahue ("Donahue"), former District Chief of the Fourth District, because he concluded that Donahue was responsible for investigating the allegations of racial slurs broadcast over CFD radios and securing very long suspension for those responsible. Defendant promoted Donahue from District Chief to Deputy Fire Commissioner, Support Services, because he had observed Donahue at meetings and on the scene of emergencies and thought Donahue's personality and management style was a good fit for his team. Defendant felt that Donahue was aggressive because Donahue was responsible for a "timely" and "aggressive investigation" into allegations regarding the broadcasting of racial slurs over the CFD radio which resulted in a 90-day suspension of the offending person, which Defendant believed was the longest suspension in the history of the CFD.

Plaintiff asserts that his work was equally impressive and his non-promotion is evidence of discrimination but Plaintiff does not provide information about any equally striking work of his. Donahue was investigating and resolving an issue which Plaintiff agrees was generating media criticism and damaging the CFD. Plaintiff denies that Defendant promoted Donahue for reasons other than his performance. He concedes that Defendant considered Donahue's performance but Plaintiff does not believe that Donahue actually secured suspensions in connection with the broadcast of racial slurs. Plaintiff offers no basis for this belief.

Defendant demoted Connolly (non-African-American) from Deputy Fire Commissioner to Assistant Deputy Fire Commissioner because Defendant felt that Connolly's "overall characteristics did not necessarily fit with [his] managerial style and [his] objectives of the

14

department." Plaintiff says Connolly's case was not similar to his because the two men had different ranks. But the action against them was the same: demotion one level down.

Defendant demoted Sal Marquez ("Marquez") (non-African-American) from Deputy Fire Commissioner to District Chief because he felt that the qualities he saw in Marquez were more suited for an administrative position, and the District Chief position is "overwhelmingly administrative." Plaintiff denies none of this but he says Marquez's case cannot be measured against his own because Marquez's reassignment was a mistake. The position of District Chief in the Third District involved serving as an Incident Commander and responding to 211 alarm fires, but, according to Plaintiff, Marquez lacked fire ground experience. Defendant testified that overseeing fire response by fire companies is one of the managerial functions of a District Chief in Fire Suppression and Rescue. Even if true it is still a substantial demotion for a non-African-American.

Defendant felt that Marquez should remain a part of his exempt rank management team, but as a District Chief rather than as a Deputy Fire Commissioner. Defendant had someone else in mind for the Deputy Fire Commissioner position. Defendant's assessment of Marquez was based on his observations of Marquez's "overall demeanor and style" during their interaction over the years.

Plaintiff asserts that Defendant initially testified that Marquez lacked the qualities he was looking for as they related to Defendant's management style and managerial goals. Nine months later, Defendant moved Marquez from District Chief for the Third District to District Chief Headquarters, creating a new District Chief position to do so. Defendant doesn't know why he moved Marquez out of his assignment as District Chief, Third District and assigned him to headquarters.

15

Defendant promoted Donnellan to Assistant Deputy Fire Commissioner, Department Inspector, because he believed Donnellan had an aggressive management style and enthusiasm. Plaintiff denies this but offers no reason for his denial except for his unproven assertion that there is evidence that would prove his denial.

While he was Commissioner, Defendant made efforts to increase the number of African-Americans, women, and Hispanics serving in the exempt ranks. Defendant stated that "when [he] was the Fire Commissioner, for the first time in the history of the Chicago Fire Department there were more African-Americans in positions of authority, and in positions of exempt rank. There were more women in position of authority and in exempt ranks [and] there were more Latinos in positions of authority and positions of [exempt] rank….".

Plaintiff does not dispute this though he qualifies it by saying that some important command positions were not filled by African-Americans, though he offers no similar qualifying remarks about women or Latino appointments. He also recites the history of reported discrimination against African-Americans for many years. He does not allege that Defendant participated in any of those acts of discrimination.

Below is a list identifying the African-American individuals Defendant appointed to the exempt ranks after issuing P.O. 2004-10, and whether the appointment was a promotion, demotion or lateral reassignment:

1. Heard, Kimberly – Lateral reassignment

2. Ijimakin, Bernard O. – Promotion

3. Noy, Leslie – Promotion

4. McGill, Demarre – Promotion

5. Gault, Dennis – Twice promoted

6.  Muse, Larry – Promotion

7.  Powell, Curtis – Promotion

8.  Wiley-Earls, Carmelita – Promotion

9.  Williams, Winston – Promotion

10.  Hooper, Lee – Promotion

After Defendant issued P.O. 2004-10, he demoted only two individuals from exempt rank positions  (Jodi Warrick and Mark Sanchez), neither of whom are African-American.

## IV.  STANDARD OF REVIEW

Summary judgment is proper only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In deciding whether a genuine issue of material fact exists, "a trial court must view the record and all reasonable inferences drawn therefrom in the light most favorable to the non-moving party."  *Robin v. Espo Engineering Corp.*, 200 F.3d 1081, 1088 (7th Cir. 2000).  This standard principle of summary judgment is applied with "added rigor" in employment discrimination cases because they often turn on intent and credibility. *Pitasi v. Gartner Group, Inc.*, 184 F.3d 709, 714 (7th Cir. 1999).

To defeat a motion for summary  judgment, the non-moving party may not rest on its pleadings, but "must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial."  *Espo Engineering*, 200 F.3d at 1088.

## V.  DISCUSSION

*Prima Facie* Requirements

17

Federal law provides several causes of action for Plaintiffs bringing racial-discrimination-in-employment claims to pursue. Title VII is the most frequently invoked, and its general *prima facie* framework for the purposeful-discrimination element has been treated by the higher courts as applicable to both § 1981 and § 1983 claims. *See Bennett v. Roberts*, 295 F.3d 687, 697-98 (7th Cir. 2002)**;** *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506 n. 1 (1993).

There are two ways of demonstrating a *prima facie* case of Title VII race discrimination: the direct method and the indirect method. *Luckie v. Ameritech Corp.*, 389 F.3d 708, 714 (7th Cir. 2004). Both parties agree that Bates has no direct evidence of racial animus, and thus cannot proceed under the direct method. Under the indirect method, Bates must establish a *prima facie* case of discrimination by demonstrating that: (1) he is a member of a protected class, (2) he reasonably performed his job to his employer's expectations, (3) he suffered an adverse employment action, and (4) his employer treated similarly situated employees outside his protected class more favorably. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Contreras v. Suncast Corp.*, 237 F.3d 756, 759 (7th Cir. 2001). If Bates satisfies each of these elements, the burden then shifts to his employer to offer a legitimate, non-discriminatory reason for the employment decision. *McDonnell Douglas*, 411 U.S. at 802-03. If his employer successfully satisfies this requirement, then the burden shifts back to Bates to prove that his employer's stated reason is a pretext for discrimination. *Id.* at 804.

<u>Analysis</u>

The major difference in arguments of the parties is based on premises that are not so clearly articulated. The plaintiff's arguments assume, in part, that promotions to and within exempt rank should be based on the same process that usually applies to non-exempt rank promotion in public safety agencies. For what are sometimes called career service or merit

18

systems, promotion requires consideration of past performance, the passing of examinations

(written, oral and physical) that demonstrate the required competency in mental and physical

skills. In other words, a prescribed process that must occur before promotion is given. Exempt

ranks, on the other hand, usually involve command positions, relatively few in number, where the

criteria take into account compatibility on methods and goals and personalities along with

elements of personal trust or distrust. Persons of high merit can lose out to those with less merit

simply because the commander in question does not like someone's "attitude." There has been

an accepted and recognized need for such discretion. The plaintiff argues from the career service

model.[1] The defendant argues from the exempt model.

Neither party delineated the precise degree to which CFD uses either model but I have

inferred that both are used, more or less, in the common way I have described. In Plaintiff's

affidavit he describes his own progress in terms that indicate CFD had a career service process as

well as exempt ranks. ("I was the highest scoring member of my 1977 class on the 1987 captain's

exam." Plaintiff Affidavit, ¶ 3)[2]

Plaintiff constructs his case on two themes. First is his personal knowledge of years of

discrimination against African-Americans in CFD. He offers his own experience and a variety of

public reports on the issue (and could have added a few judicial decisions as well). For purposes

---

[1] To the extent that Plaintiff is claiming that the use of highly subjective criteria for promotion to or demotion within exempt ranks is itself a violation of constitutional rights, Defendant would be entitled to qualified immunity since such criteria have never been held to be prohibited on constitutional grounds.

[2] The exempt rank system defeats any claim that Plaintiff had contractual rights to any specific exempt position. There is no dispute that a new commissioner had the right to pick his own people for his own team. This was the expectation of both commissioners and their subordinates under the undisputed facts of the case.

of this motion, I must accept his description of a discrimination culture in CFD during his tenure there, and neither Defendant nor the City challenges any of these allegations during the summary judgment phase of the case. The central difficulty for Plaintiff is his inability to offer any proof that Defendant had a racially discriminatory motive when he demoted Plaintiff.

There are no discriminatory remarks made by Defendant. There is nothing to suggest that Defendant himself perpetrated discriminatory acts on any occasion other than the one alleged by Plaintiff. The statistics do not evidence racial discrimination in Defendant's decisions. Plaintiff relies on evidence of discrimination by prior leaders in CFD but offers nothing to effectively impeach Defendant's conduct as Commissioner in his personnel decisions. All Plaintiff offers is his own opinion that Defendant's true motivation in demoting Plaintiff was based, at least in part, on race. Yet this opinion is based essentially on Plaintiff's ability to read Defendant's mind and nothing else. This is a proposition that no reasonable jury could accept even if Defendant were white. While it is possible that an African-American may regard his own race as unsuited for promotion, as the EEOC and several federal courts have recognized, it is not a common occurrence and there is nothing to show that Defendant is himself racially biased against members of his own race.

Second, Plaintiff finds evidence of discrimination in the fact that Defendant's decision-making process was flawed because he did not know enough about Plaintiff to make an informed decision as to his demotion. This argument is supported by general (and correct) principles that promotional decision should be based on thorough knowledge of the candidate's abilities as tested in his prior work. But there is nothing in the exempt rank system, or federal anti-discrimination law, that requires this. Defendant thought that Plaintiff did an acceptable job as District Chief. But exempt rank decisions are usually made among candidates all of whom did

their job well.  The decision to leave in place or promote or demote usually hinges on personal

compatibility with higher leadership, willingness to execute the Commissioner's priorities (rather

than the ones the candidate might prefer), respect for the Commissioner and support for the

Commissioner.

There are many reasons Defendant had for demoting Plaintiff.  One permissible reason

would be the fact that Defendant did not know Plaintiff well.  Higher positions of trust (exempt

ranks) are routinely given to those who the leader knows fairly well.  Another lawful reason

would be the general image of the CFD that Defendant wanted his leadership team to project.

Plaintiff makes no bones about his own bitterness toward the way CFD treated him and other

African-Americans.  An African-American commissioner (the first in CFD) might not want such

a person as an important part of his team if he believed that this bitterness about the past would

be evident.

The problem that Defendant faced early in this case was that he was not precise about his

reasons for demoting Plaintiff.   He did not cite the absence of loyalty, or of experience working

together or personality conflicts. Instead Defendant said his decision to demote Plaintiff was

based on "[his] own personal assessment, [his] own judgment [and his] own feeling" as to

whether Plaintiff fit the "aggressive leadership style and management style" that he needed.

Defendant was looking for a "certain level of enthusiasm and aggressiveness and other traits,"

and he did not recall observing these characteristics in Plaintiff.  The plaintiff does not deny that

these were Defendant's opinions.

Defendant's imprecision in explaining his reasons for demoting Plaintiff, coupled with

factual disputes over whether Defendant ever observed Plaintiff in his role as District Chief, led

me to reinstate Count I after initially granting summary judgment to Defendant City of Chicago.

I did this out of maximum solicitude to Plaintiff's claim. However, after a more thorough review of the record, I've changed my mind–no reasonable jury could find that Defendant's non-discriminatory reasons for demoting Plaintiff were pretextual. What Defendant gave was the diplomatic expression that Plaintiff was not the kind of person he wanted on his team.

Ordinarily when the reasons given by a decision maker contradict the true reasons, this is enough to justify proceeding with the case. Here, the highly generalized answer given by Defendant is not inconsistent with the facts which reasonably support demotion. His statement that he could not recall observing "enthusiasm and aggressiveness" in Plaintiff is quite consistent with their infrequent contact. If lack of contact with a new leader is the reason why Plaintiff's career suffers, he would be joining a very long line of men and women.

Plaintiff cannot establish a *prima facie* showing for his § 1981 and § 1983 claims because he cannot demonstrate discriminatory intent, either directly or indirectly. He cannot identify a single District Chief who was retained though Defendant believed that person failed to meet Defendant's requirements for the job. More importantly, even if the *prima facie* case were made, Defendant had legitimate reasons for demoting Bates–his lack of confidence that Plaintiff would meet the specific style that Defendant wanted on his team. In any event, Defendant appointed another African-American to replace Plaintiff. This is a case, as I have noted several times, in which the decision depends not on objectively measurable skills which all or most applicants will possess. The result may legitimately be based on impressions and gut feelings. There is no evidence that the decision was based on anything other than Defendant's subjective judgment on whether Plaintiff was a proper fit for his leadership team.

Further, the numbers do not support the claim of race discrimination. Plaintiff was the only African-American District Chief who was demoted during Defendant's tenure but he did

demote whites. The number of African-Americans serving as District Chiefs increased by one at the same time he demoted Plaintiff, and Defendant promoted several other African-Americans later in his tenure.

Plaintiff offers only his subjective opinions that Defendant bore the same racial animus that he accuses Defendant's white predecessors of having, with no explanation of why this would be so. Plaintiff has testified and declared many reasons why Defendant made a mistake in demoting him and promoting others. This self-interested conclusion is not supported by the testimony of any other witnesses, even from the ranks of retired CFD personnel. In the end, no reasonable jury could find that Plaintiff has proven that Defendant's actions were racially motivated. The best that Plaintiff could theoretically achieve would be a tie in the weight of evidence and all ties go to the defendant in these cases.

I am also reversing my December 14, 2009, order reinstating Count I. Plaintiff's Title VII claim against Defendant City of Chicago is subject to the same liability standard as the § 1981 claim. *See Bennett,* 295 F.3d at 697-98. His inability to make a *prima facie* showing as to one necessarily translates to the other.

The plaintiff's motion for partial summary judgment is denied. It is based on the premise that Defendant did not follow the career service model in deciding to demote Plaintiff. At most this could prove is that Defendant made an error in his decision to demote, that he demoted the wrong person. This alone cannot establish that the demotion was racially based. There is evidence that Defendant made his assessment based on his perception of Plaintiff's ability or willingness to do what it takes to be a member of a new Commissioner's team. There is undisputed evidence that Plaintiff said something that clearly suggested he might lack loyalty to a Commissioner. Defendant claims to have made the decision on the basis of how well Plaintiff

23

would "fit in" with the management style and goals Defendant had in mind.  These are reasons

on which Defendant could rely (rightly or wrongly) in demoting Plaintiff.  Leaving aside the fact

that the position Plaintiff lost eventually went to an African-American and the decision maker

was himself African-American, there is no lawful way to grant partial summary judgment to

Plaintiff.

**CONCLUSION**

For the foregoing reasons, Defendant's motion for summary judgment is granted and

Plaintiff's motion for partial summary judgment is denied.  I reverse my December 14, 2009,

order reinstating Count I and reenter summary judgment in favor of Defendant City of Chicago.

ENTER:

James B. Zagel
United States District Judge

DATE:  January 31, 2012